UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NO.: 1:05-CR-019 |
| | ) | |
| v. | ) | (JUDGE KANE) |
| | ) | |
| ELDEN PIERRE HANNAH | ) | (ELECTRONICALLY FILED) |

**BRIEF IN SUPPORT OF DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE**

The Defendant, Elden Pierre Hannah, through his counsel, Kenneth W. Ravenell, and Schulman, Treem, Kaminkow, Gilden & Ravenell, P.A., along with John Yaninek Esquire, and Mette, Evans & Woodside, P.C., hereby files this Brief in Support of Defendant's Motion to Suppress Evidence, and in support thereof, states:

**INTRODUCTION**

Mr. Hannah is charged in a seven (7) Count indictment with possession with intent to distribute five (5) kilograms or more of cocaine and conspiracy to possess with the intent to distribute five (5) kilograms or more of cocaine. On December 29, 2004, a search and seizure warrant was executed at the Defendant's residence located at 3574 Highway 501, Conway, South Carolina. The fruits of that search along with statements made by the Defendant to Federal Agents, upon his arrest in the State of Georgia on December 30, 2004, and the fruit of those statements should be suppress as they were obtained in violation of the Fourth Amendment and the Fifth Amendment to the United State's Constitution.

**STATEMENT OF FACTS**

The following alleged facts may be gleaned from the affidavit submitted to support the application for the search warrant:

On August 3, 2004, members of the Horry County Police Department, located in South Carolina, interviewed an individual by the name of Joe K. Graham, after Graham surrendered to police on state charges of cocaine distribution and other related charges. During that interview, investigators asked Graham what he knew about Elden Hannah. Graham allegedly stated that he first met the Defendant at a motorcycle racing event during the later part of 2003. Sometime thereafter, the Defendant allegedly offered Graham one (1) kilogram of cocaine whereby Graham accepted the same. Soon thereafter, the Defendant allegedly asked Graham if Graham could supply the Defendant with cocaine whereby Graham contacted one of his sources, purchased one (1) kilogram of cocaine and sold it to the Defendant. According to Graham, he estimated that over the last twelve months from the time of his interview with police, he purchased at least twelve (12) kilograms of cocaine from the Defendant.

On December 29, 2004, a Pennsylvania State Police Trooper initiated a traffic stop on a vehicle that was being driven by Andre Nesmith. A records check revealed that the vehicle Nesmith was driving was registered to an "E.P. Hannah, 1413 Highway 17, South, Surfside Beach, SC." The Trooper received consent to search the vehicle and as a result, the Trooper located a portable compact disc box which contained approximately three (3) kilograms of cocaine. Also recovered was a garage door opener. Nesmith was arrested and agreed to cooperate with the ongoing investigation of the Defendant.

According to the affidavit, Nesmith stated that the Defendant was his cousin and that he had been assisting the Defendant with distributing cocaine since August of 2004. According to Nesmith, he along with the Defendant would receive the cocaine from two "Mexican" males in the Atlanta, Georgia area. Once they would receive the cocaine, Nesmith would allegedly transport three to five (3-5) kilograms of cocaine per week to his other cousin, Tony Washington,

2

who was located in Rochester, New York. According to Nesmith, he would make two trips on a weekly basis to New York: one to deliver the cocaine, and the other to pick up the drug proceeds. From there, Nesmith would allegedly deliver the proceeds to the Defendant in Atlanta.

As for this particular trip, Nesmith explained that at approximately 2:00 am, on December 28, 2004, the Defendant allegedly provided him with the portable compact disk box which contained six (6) kilograms of cocaine and asked Nesmith to drive the box to his residence in South Carolina. According to Nesmith, the Defendant provided him with a remote control to the garage and asked Nesmith to put three (3) of the six (6) kilograms of cocaine in the garage under the middle cushion of a black leather love seat. Nesmith allegedly delivered the cocaine to the residence on December 28, 2004 and allegedly placed the three (3) kilograms of cocaine under the cushion to the love seat. Nesmith then stayed overnight in the Myrtle Beach area and departed the next morning for New York with the remaining three (3) kilograms of cocaine. According to Nesmith, he allegedly received a telephone call from the Defendant at approximately 6:30 am, and the Defendant allegedly advised Nesmith that he had obtained the cocaine from his residence and was on his way back to Atlanta.[1]

At the conclusion of Nesmith's interrogation, Barry Wilson, the Special Agent who interviewed Nesmith, contacted Sergeant Mike Cannon of the HCPD and asked if a digital photograph could be taken of the residence located at 3574 Highway 501, Conway, South Carolina. A photograph was taken of that residence and emailed to Agent Wilson. Agent Wilson

---

[1] According to Nesmith, he *believes* the Defendant leaves the cocaine inside the residence and drives back to Atlanta so that he can allow the situation to calm down and check for police scrutiny.

summarily showed the photograph of the residence to Nesmith whereby Nesmith positively identified the house as the house he had delivered the cocaine to.

On December 29, 2004, Agent Wilson appeared before the Honorable Thomas E. Rogers, III, a United States Magistrate Judge in the United States District Court for the District of South Carolina, and obtained a search and seizure warrant for 3574 Highway 501, Conway, South Carolina. On that same evening, members of the Federal Bureau of Investigation along with other officers from local agencies executed the search and seizure warrant. A search of that residence resulted in the seizure of over five hundred (500) grams of cocaine, one (1) digital scale, twenty (20) 9mm rounds of ammunition as well as miscellaneous papers.

On December 30, 2004, as a result of the seizure of narcotics from the Defendant's residence on December 29, 2004, the Defendant was arrested in Decatur, Georgia. While in the custody of authorities in Georgia, the Defendant was read his Miranda Rights and proceeded to speak with Special Agent Terrence Brown and TF/A Dan Titus. Initially, the Defendant gave Special Agent Brown consent to search his office located at 3009-D Rainbow Drive, Decatur, Georgia as well as his residence located at 4003 Ambrose Way, Ellenwood, Georgia.

Thereafter, Agent Brown and TF/A Titus transported the Defendant to the Atlanta Detention Facility. While en-route, Agent Brown advised the Defendant that Agents from Pennsylvania, South Carolina, and Florida were conducting an investigation into the Defendant's association with known drug traffickers, and explained that if the Defendant was indeed the person the agents were looking for, it would be in the Defendant's best interest to cooperate with

law enforcement officers.[2]  Prior to Agent Brown and TF/A leaving the detention facility, the Defendant explained that he would like to help himself and give Agent Brown information on individuals he knew were involved in the drug trade.  Agent Brown and TF/A Titus proceeded to take the Defendant to a private room where the Defendant explained that he normally purchases marijuana for personal use from two Hispanic males that went by the names Peter and Rex.  The Defendant explained that although he never purchased cocaine from Rex (later identified as Reyes Duarte Maldonado, hereinafter "Maldonado") or Peter, he had seen Maldonado and Peter with up to a duffel bag full of cocaine.  The Defendant went on to explain that on one occasion, he saw at least ten (10) kilograms of cocaine in Maldonado's apartment.  The Defendant explained that whenever he wanted to purchase drugs, he would call Maldonado, who in turn, would notify Peter, who would then set the price for the purchase and give the okay to distribute the drugs to the Defendant.

The Defendant then proceeded to cooperate with the agents even further by agreeing to place a call to Maldonado in order to setup a deal whereby the Defendant would purchase five (5) kilograms of cocaine from Maldonado.  Agent Brown proceeded to dial the telephone number, provided by the Defendant and belonging to Maldonado whereby the Defendant then spoke with Maldonado and explained that he needed "cinco" (five) kilograms of cocaine on December 31, 2004, and Maldonado agreed.

As a result of the Defendant's cooperation, police later arrested Maldonado whereby Maldonado later agreed to also cooperate with authorities in exchange for a favorable plea.  On August 3, 2006, Maldonado plead guilty to one Count of Interstate Travel in Aid of Racketeering

---

[2] At a hearing on the Motion to Suppress, the Defendant's statements and the fruits of his cooperation, the evidence will show that Agent Brown did more than state that the Defendant's

and received a sentence of five (5) years with three years of supervised probation.  Although the Defendant fully cooperated with Authorities after his cooperation was improperly induced, the Government is now seeking to use the information obtained through the interrogation of the Defendant against him.  This timely Motion to Suppress followed.

## ARGUMENT

**A.     There was no probable cause to search the Defendant's residence.**

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizure, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.  An individuals home is "sacrosanct, and unreasonable intrusion into the home is the 'chief evil against which the wording of the Fourth Amendment is directed.'" United States v. Zimmerman, 277 F.3d 426, 431-32 (3d. Cir. 2002) (citing Payton v. New York, 445 U.S. 573, 585 (1980) (quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)).  In assessing whether there was probable cause to issue a search warrant, the magistrate judge is obliged to determine "whether given all of the circumstances set forth in the affidavit before him, there is a fair probability contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).  The Supreme Court has interpreted the Fourth Amendment to exclude from use of evidence those items which are seized during an unconstitutional search.  Mapp v. Ohio, 367 U.S. 643 (1961).

The Supreme Court has also adopted a "totality of circumstances" test to determine whether probable cause supported a search warrant based on an informant's information to police.

---

cooperation will be in his best interest.

6

Two factors are key to this analysis: the informant's "veracity" or "reliability" and his or her basis of knowledge. *See* Illinois v. Gates, 462 U.S. 213, 233 (1983); see also, United States v. Brown, 448 F.3d 239, 249 (3d. Cir. 2006); United States v. Wilhelm, 80 F.3d 116 (4th Cir. 1996); United States v. Martinelli, 454 F.3d 1300 (11th Cir. 2006). Although appellate courts should afford deference to the magistrate's findings, this does not mean that warrants based on conclusionary allegations should be upheld. "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." Gates, supra, at 236.

In the case *sub judice*, the alleged probable cause contained in the affidavit in support of the search warrant for the Defendant's home came from information that was obtained through interviewing Joe Graham and Andre Nesmith, two individuals who were facing criminal charges of their own and who police had never met before prior to interviewing them. There is no detailed information provided about Graham's or Nesmith's track record for the magistrate to make an independent finding of probable cause as the Supreme Court indicated is necessary in Gates. In this case, Mr. Graham provided the following information, in pertinent part:

- During the later part of 2003, Mr. Graham allegedly met the Defendant at a motorcycle racing event.

- Sometime thereafter, the Defendant allegedly offered Mr. Graham cocaine whereby Mr. Graham allegedly accepted (1) kilogram of cocaine.

- Sometime thereafter, the Defendant allegedly purchased (1) kilogram of cocaine from Mr. Graham and that in total, over a one year period, the Defendant allegedly sold approximately (12) kilograms of cocaine to Mr. Graham.

The **only** corroborating evidence that was mentioned in the affidavit in support of the search warrant was a single sentence whereby Mr. Graham allegedly identified a photograph of the Defendant, and referred to the Defendant as "Pierre."

As for the information provided by Andre Nesmith, it is as follows:

- Nesmith allegedly indicated that he had been allegedly assisting the Defendant in distributing cocaine since August, of 2004.

- On December 28, 2004, the Defendant allegedly gave Nesmith six (6) kilograms of cocaine and instructed Nesmith to deliver three of the kilograms to his house in South Carolina, placing that portion in the garage area, and delivered the remaining three (3) kilograms of cocaine to a customer in New York.

- Nesmith explained that on December 29, 2004, he was en route to the New York area to drop off the three (3) kilograms of cocaine when the Defendant allegedly contacted him by phone and explained to Nesmith that he had obtained the cocaine from his residence and was on his way back to Atlanta.

The only corroborating statement contained in the affidavit to support Nesmith's assertions came when one of the Agents showed Nesmith a picture of the Defendant's house and asked Nesmith to identify whether the house in the picture was the Defendant's house, and Nesmith identified it as so. This form of corroboration or test of veracity is weak at best. Instead of the agent asking Nesmith to describe the Defendant's home prior to showing Nesmith the picture of the home, the Agent did just the opposite and simply took Nesmith for his word. This clearly does not corroborate Nesmith's story to police nor does it support Nesmith's veracity for truthfulness. The affidavit contains no information that the police attempted to have either Graham or Nesmith make a controlled call to the Defendant to corroborate this information even

after Nesmith explained to the police that the Defendant called him the day before he was stopped to inform Nesmith that he was on his way back to Atlanta. What the police may have corroborated are innocent details, regarding where the Defendant maintains a home at 3574 Highway 501, Conway, South Carolina. That simply is not enough. See United States v. Ritter 416 F.3d 256 (3rd Cir. 2005) (discussing the importance of corroborating statements made by informants); see also, United States v. Roberson, 90 F.3d 75 (3rd. Cir. 1996). Moreover, the information provided by Graham, regarding the description of the Defendant, does not mean that Graham was reliable even if the description of the subject turns out to be accurate. See Florida v. J.L., 529 U.S. 266, 271 (2000).

Additionally, the Fourth Circuit has explained that in evaluating whether an informant's tip establishes probable cause, the degree to which the tip is corroborated is an important consideration. United States v. Wilhelm, 80 F.3d 116 (4th Cir. 1996). In Wilhelm, the Court found that the affiant did not adequately support the magistrate's finding of probable cause. The affidavit depended on information from an unnamed informant and provided no indication of that informant's truthfulness or reliability. Also, the Court found the minimal corroboration was insufficient. The only corroboration provided was that the informant's directions to the home was correct. The Court stated, "almost anyone can give directions to a particular house without knowing anything of substance about what goes on inside the house, and anyone who watches the evening news can make generalizations about what marijuana looks like and how it is packaged and sold."

Therefore, for the above mentioned reasons, the affidavit in support of the search and seizure warrant for the Defendant's home relied entirely on information provided to police and Federal Agents by two individuals who were not previously known to police, have no history of

veracity, and whose statements to authorities were not corroborated in any meaningful way, if at all.  Because the magistrate's actions cannot be a mere ratification of the bare conclusions of others, any evidence seized must be suppressed.

      **B.**     **There was no nexus between the alleged criminal activity and the     place to be searched**.

In <u>United States v. Lalor</u>, 996 F.2d 1578 (4th Cir. 1993), the Fourth Circuit found that the affidavit was devoid of any basis from with the magistrate could infer that there was evidence of drug activity at Lalor's residence.  The Court noted that the affidavit did not describe circumstances which indicated that such evidence was likely to be stored at Lalor's residence nor did it explain the geographic relationship between Lalor's residence and the area where drug sales occurred.  The Court emphasized "residential searches have been upheld only where some information links the criminal activity to the defendant's residence." <u>Id</u>. at 1583.

In this case, there is only one piece of information within the Affidavit that links the Defendant's alleged criminal activity to the Defendant's house in South Carolina, that being Nesmith's uncorroborated statement to authorities that he delivered cocaine to the Defendant's house prior to making his trip to the New York area.  There was absolutely no other investigation to corroborate Nesmith's statement to determine whether in fact drugs would be found at that residence.  As noted by <u>Lalor</u>, the fact that the Defendant has a residence is not probable cause to believe evidence of a crime will be located at that address.  In short, the warrant affidavit lacked sufficient nexus between the Defendant's criminal activity and the Defendant's residence, the place to be searched.  As such, the affidavit lacked probable cause for the magistrate to conclude that evidence of illegal conduct would be found at that address, the warrant should not have issued, and the evidence seized must be suppressed.

### C. The Defective Warrant Cannot Be Justified Under A Good Faith Exception to the Warrant Requirement.

In <u>Leon v. United States</u>, 468 U.S. 897, 104 S. Ct. 3405 (1984), the Supreme Court recognized a good faith exception to suppression of evidence obtained from a deficient warrant. The good faith exception, however, does not apply:

> first, when the warrant is based on an affidavit containing "knowing or reckless falsity"; second, when the magistrate has simply acted as a "rubber stamp" for the police; third, when the affidavit does not "provide the magistrate with a substantial basis for determining the existence of probable cause"; and finally, when the warrant is so "facially deficient" that an officer could not reasonably rely on it.

<u>United States v. Wilhelm</u>, 80 F.3d 116, 121 (4th Cir. 1996) (quoting <u>United States v. Leon</u>, <u>supra</u>, 468 U.S. at 923, 104 S. Ct. at 3420. The good faith exception cannot save the unconstitutional search of the Defendant's home.

In this case, it is clear that the issuing judge certainly abandoned any detached or neutral role by authorizing a warrant based upon an application bereft of probable cause to connect the Defendant's alleged drug activities to the place to be searched. <u>United States v. Wilhelm</u>, <u>supra</u>, 80 F.3d at 121 (good faith exception does not apply due to "bare bones" nature of affidavit and because state magistrate could not have acted as other than a rubber stamp in approving such an affidavit).

Secondly, the warrant could not have provided any basis for the issuing judge to determine the existence of probable cause to search the Defendant's residence because of the lack of nexus between the alleged criminal activity and the place to be searched. Thirdly, the officers executing the warrant had no objectively reasonable basis for believing the warrant was valid. There were no sufficient allegations set forth in the affidavit to establish a relation between the Defendant's alleged criminal conduct and the Defendant's house. The police must be presumed to know the

11

law.  Wolf v. Colorado, 338 U.S. 25 (1949) (holding that "every police officer should know the laws and rules of evidence.")

Inasmuch as the warrant affidavit lacks probable cause, and because the good faith exception does not apply, the evidence seized from the Defendant's residence, as a result of the execution of that warrant must be suppressed.

### D. The Statements Made By The Defendant To Agents After His Arrest and the Fruit of the Statements Must Be Suppressed.

In the seminal case of Bram v. United States, 168 U.S. 532 (1897), the Supreme Court, addressed for the first time, whether a statement made by a defendant to police, can be used against him at trial when that statement was improperly induced.  In addressing this issue, the Court explained as follows:

> In criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the Constitution of the United States, commanding that no person "shall be compelled in any criminal case to be a witness against himself. . . ." [A] confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . . **A confession can never be received in evidence where the prisoner has been influence by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted**.

Id. at 542-43.  (Emphasis added).  See also, Brady v. United States, 397 U.S. 742, 754 (1970)(where the Court followed the holding in Bram, and explained that "even a **mild promise of leniency** [is] deemed sufficient to bar the confession, not because the promise [is] an illegal act

as such, but because defendants at such times are too sensitive to inducements and the possible impact on them too great to ignore, and too difficult to assess.") (emphasis added).

In order to ascertain whether a defendant's confession to authorities was made voluntary and not improperly induced, this Court must look at the totality of the circumstances surrounding the confession. Miller v. Fenton, 796 F.2d 598 (3rd. Cir. 1986). "The question in each case is whether the Defendant's will was overborne when he confessed." Id. The burden is on the government, to establish, by a preponderance of the evidence, that a challenged confession was voluntary. United States v. Walton, 10 F.3d 1024 (3rd. Cir. 1993).

In the case *sub judice*, a review of the totality of the circumstances reveals that the Defendant's statements to Agent Brown and TF/A Titus were improperly induced. As mentioned previously, prior to transporting the Defendant to the Atlanta Detention facility, Agent Brown admits that at a minimum, he explained to the Defendant that if he was indeed the person the agents were looking for, then it would be in the Defendant's **best interest to cooperate** with law enforcement officers. Sometime shortly after Agent Brown made that statement, the Defendant told agent Brown and TF/A Titus that he would like to talk to them. The agents immediately took the Defendant to a private room where Agent Brown and Agent Titus began to question the Defendant. At a hearing on this motion, the evidence will show that Agent Brown made further statements to the Defendant that improperly induced the Defendant's cooperation. Given the Defendant's position at the time, he was easily susceptible to inducements by the Agents. This is evident by the fact that the Defendant proceeded to assist the Agents in making a controlled call to Maldonado wherein Defendant successfully placed an order to purchase five (5) kilograms of cocaine.

Even in light of the cooperation that the Defendant exhibited to Agents Brown and Titus, the Government now seeks to use the statements made by the Defendant to the Agents after his arrest, and the fruit of those statements against him. Because these statements were improperly induced, this Court should find that the statements and the fruit can not be used by the Government against the Defendant. See, Choi Chun Lam v. Kelchner, 304 F.3d 256 (3rd. Cir. 2002)

## **CONCLUSION**

For the aforegoing reasons, the Defendant respectfully requests that a hearing on the Defendant's Motion to Suppress be held and that this Honorable Court grant his Motion to Suppress.

Respectfully Submitted,

s/Kenneth W. Ravenell
Kenneth W. Ravenell, Esquire
Shulman, Treem, Kaminkow,
Gilden & Ravenell, P.A.
The World Trade Center, 18th Floor
401 East Pratt Street
Baltimore, Maryland 21202
410-332-0850

s/John F. Yaninek
John F. Yaninek, Esquire
Mette, Evans & Woodside
3401 North Front Street
P.O. Box 5950
Harrisburg, P.A. 17110

Date: September 20, 2006

**CERTIFICATE OF SERVICE**

    I, JOHN F. YANINEK, of Mette, Evans & Woodside do hereby certify that on this date I served a copy of the forgoing Brief in Support of Defendant's Motion to Suppress Evidence via electronic service, addressed to the following:

    (William.Behe@usdoj.gov)
William Behe, Assistant U.S. Attorney
U.S. Department of Justice
Office of the U.S. Attorney
Federal Building, Suite 220
228 Walnut Street
Harrisburg, PA 17108-1754


METTE, EVANS & WOODSIDE

s/John F. Yaninek
John F. Yaninek, Esquire
Sup. Ct. I.D. No. 55741
3401 North Front Street
P. O. Box 5950
Harrisburg, PA 17110-0950
(717) 232-5000 - Phone
(717) 236-1816 - Fax
Attorneys for Defendant

Date: September 20, 2006